IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

PETER J. LONG,

       Plaintiff,                                    OPINION AND ORDER

v.                                                16-cv-149-slc

MICHAEL L. HAMMER, *et al.*

       Defendants.
_____

In this civil lawsuit, *pro se* plaintiff Peter J. Long claims that defendant Michael Hammer, the librarian at Prairie Du Chien Correctional Institution, retaliated against him in violation of his First Amendment rights, and that defendants Ronald Brewer, Chad Cline, Lisa Pettera, Mandy Mathson and Tim Haines failed to intervene to prevent or stop the retaliation from occurring. Defendants have filed a motion for summary judgment (dkt. 25) that is ripe for decision. I am granting defendants' motion for the reasons stated below.

UNDISPUTED FACTS[1]

A.    **The Parties**

At all times relevant to this case, Peter Long was incarcerated at Prairie Du Chien Correctional Institution ("PDCI"), where all defendants are employed. Defendant Michael Hammer is the staff librarian; Ronald Brewer is the former education director; Chad Cline is the current education director; Lisa Pettera is the program supervisor; Mandy Mathson is an inmate complaint examiner; and Tim Haines is the warden.

---

[1] The following facts are drawn from the parties' proposed findings of fact and responses. They are undisputed unless otherwise noted. I have drawn all reasonable inferences in Long's favor.

1

**B.    Long Asks Hammer to Print Letters to Newspapers**

In April 2014, Long was defending a civil foreclosure action in state court concerning an apartment building he owned. In that case, Long filed counterclaims against Acquired Capital II, L.P. for breach of good faith and fair dealing, consumer protection laws, federal banking laws and other state laws. Long wished to send press releases to several newspapers regarding the lawsuit because he believed that his claims exposed unlawful actions of U.S. Bank National Association that would be of public interest. Long also believed that the negative publicity generated by his press release would pressure Acquired Capital to settle with him.

Long composed a letter regarding his counterclaims that he intended to send to the legal news departments of The Wall Street Journal, Milwaukee Sentinel Inc., The Post-Crescent, Capitol Newspapers, USA Today and Gannet Co. Inc. In his letter, Long described his background, education and history of arrests, as well as the foreclosure action and his counterclaims. In his letters Long asked the editors to publish articles regarding U.S. Bank National Association's treatment of its customers.

On May 2, 2014, Long asked defendant Hammer to use the library printer to print six copies of Long's letter for Long to mail to the six news organizations. Hammer refused on the basis that PDCI policies limited use of the prison computers to create and print "legal" documents. Hammer's view was that even though Long's letter was related to his state court lawsuit, letters to news organizations were not "legal" in nature, they were "personal." Long responded by telling Hammer that if he refused to print copies of the letters, then Long would file an inmate complaint against him.

That same day (May 2, 2014), Long wrote to Education Director Brewer regarding Hammer's refusal to print Long's letters to the newspapers. Brewer responded to Long that

PDCI's definition of legal correspondence includes letters to judges, courts and attorneys, but not to other non-legal sources, such as news organizations. Thus, Long was free to contact such organizations via handwritten letters, but not by using the institution's computer system. Brewer told Long that PDCI's policy was consistent with the policies of other correctional institutions, in that institution computers were not to be used for personal issues. Finally, Brewer told Long that if he disagreed with these policies, then he could file an inmate complaint.

On May 9, 2014, Long submitted an inmate complaint challenging Hammer's refusal to print the letters. After Institution Complaint Examiner Mathson discussed Long's complaint with both Brewer and Long, Mathson dismissed the complaint, agreeing with Hammer and Brewer that the letters were not "legal" documents that could be printed from state computers. Warden Haines affirmed dismissal of Long's complaint.

Long also sent two letters to Warden Haines' office complaining about Hammer's refusal to print the letters. Haines forwarded the letters to Program Supervisor Pettera for response. Pettera responded to Long's letters on May 19, 2014, agreeing with Brewer that Long's letters did not qualify as legal documents.

**C.     May 27, 2014 Yelling Incident**

On May 27, 2014, Long was in the library during Period 9. At the end of the period, Hammer yelled at Long in a "very disrespectful and unprofessional manner." (Long does not report specifically *what* Hammer yelled, but apparently it had something to do with inmates not being prepared to exit the library at the end of the period.)

That same day, Long sent Brewer an interview/information request stating, "I must talk to you asap. Mr. Hammer lost control and began yelling at me today (5-27-14) at the end of Period 9 very disrespectfully. I have many witnesses, check the cameras." Brewer contacted Hammer regarding Long's letter and directed Hammer to be sure that he used an appropriate tone and volume when talking to inmates. Brewer then wrote to Long to report that Brewer had "met with Mr. Hammer and discussed his voice tone and loudness when working with all inmates. The situation should improve."

Long also submitted an interview/information request to Warden Haines regarding Hammer's yelling, stating that Hammer had "lost control and became irate" and that he believed this was in retaliation for the offender complaint that Long had filed against Hammer the week before. On May 29, Haines responded, stating that Brewer had been contacted about the matter and had spoken with Hammer about it. Warden Haines advised Long that if he should have the same experience again, to contact Brewer so he would be able to deal with the situation in a timely and appropriate manner.

Unmollified, Long submitted an offender complaint about the incident. Mathson investigated Long's complaint and contacted Brewer. Because Long already had contacted Brewer and Haines regarding the incident, Mathson found there was no need to conduct a parallel investigation in the ICRS. On June 3, 2014, Mathson recommended that the complaint be dismissed, with an informational copy sent to Brewer. Haines agreed with Mathson's recommendation and dismissed the complaint on June 13, 2014. Long appealed, but the correctional complaint examiner and the Secretary's designee affirmed dismissal.

**D.     Denial of Law Library Use During Open Periods**

Under PDCI procedure, inmates who want extra time in the library are to sign up in advance for the extra time. Even so, up until June 2014, Hammer had allowed inmates to come to the library without advance signup if one of their scheduled classes had been canceled due to a teacher's absence. In early June 2014, however, PDCI security staff directed the education department to follow and to enforce more stringently the advance signup policy and to prohibit inmates from attending library during periods for which they had not signed up. As a result Hammer no longer permitted *any* inmates to come to the library during a free period caused by a teacher's absence.

On June 4 or 5, 2014, Long attempted to stay in the library for two periods that had opened up for him due to a teacher absence. Hammer refused to let Long stay because Long had not signed up in advance. Long told Hammer that he was going to file an inmate complaint, which he did on June 9. In his complaint, Long accused Hammer of retaliating against him by refusing to let him stay and work during his open periods. Long also sent an interview/information request to Brewer regarding the incident. Brewer responded to Long's interview/information request by informing him that, "We have been directed by security to not allow inmates to go to the library or other classes if a teacher is absent. This has been reinforced with Mr. Hammer."

Mathson investigated Long's inmate complaint regarding the incident. While investigating, Mathson learned that PDCI's Facility Procedure states: "Inmates on extra legal time list may only come to the Library during scheduled library hours." Mathson contacted Hammer and Brewer who told him that Long was not the only inmate whom Hammer had allowed to use the legal library at unscheduled times; other inmates also had been extended

this privilege in the past. However, as a result of the recent security directive, now *no* inmate was being allowed library extra time without having signed up in advance. Based on this information, Mathson recommended dismissal of the complaint, concluding that there was no evidence of retaliation or that Hammer had treated Long differently from other inmates. Haines agreed and dismissed the complaint on July 11, 2014.

Since June 2014, Long has continued using the law library on a regular basis and has been granted extra law library time due to his many ongoing legal cases. In addition to this regular law library time, Long signed up for and had an opportunity to attend extra law library time approximately 280 times from May 1, 2014 to December 31, 2014. On occasion, Long has signed up for and has received up to 5 or 6 extra periods in a single day.[2]

E.      **Long is Denied Access to Law Library Computers to Type Word Documents**

PDCI has six computers in the law library. Three of the computers are designated for primary use of Microsoft Word and three are for the primary use of LexisNexis. This apportionment has been in place since the library received the computers and was set to ensure that all inmates had access to legal programs. It is enforced for all inmates, though Long says that one inmate was occasionally allowed to use a LexisNexis computer to type legal documents in violation of the practice. (Long provides no details as to when or under what circumstances this other inmate was permitted to use the LexisNexis computers.)

---

[2] Long objects to evidence regarding the number of times he accessed the library on the grounds that defendants failed to provide this evidence in response to a discovery request he submitted. (Dkt. 55). However, Long's discovery request asked defendants to produce "a copy of all documentation which defendants expect to produce *at trial* in support of his claim that defendant Hammer did not harass the plaintiff for his use of the ICRS." Defendants objected to the request on the grounds that they would produce trial exhibits to him according to the deadlines set forth in the Pretrial Conference Order. This was an appropriate objection. Moreover, Long has had the opportunity to respond to this evidence and has suffered no prejudice by the court's consideration of it.

On June 9, 2014, Long asked Hammer if he could use one of the three unused LexisNexis legal research computers to type legal documents using Microsoft Word. Hammer denied Long's request, and Long responded by stating that he was going to file an inmate complaint. On June 11, Long submitted an offender complaint regarding the denial.

Mathson investigated Long's allegations and concluded that because inmates had access to word processing on three computers, the library policy satisfied DAI requirements. She therefore recommended dismissal of Long's complaint. Haines accepted Mathson's recommendation and dismissed the complaint on July 11, 2014.

### F. November 18, 2014 Yelling Incident

On November 18, 2014, Long approached Hammer in a hallway outside of a computer classroom. According to Long, he calmly asked Hammer a question about one of his legal documents that Hammer or his inmate library clerk had lost. Long says that Hammer "lost control by turning bright red in the face" and "yelling at Long very disrespectfully in an intimidating and demeaning manner." Long says that Hammer told him it was Long's fault that his legal document was lost. Long responded by stating, "Why are you yelling at me?" and "Please stop yelling at me!" Long immediately told Hammer he was going to file an inmate complaint about the incident. (Hammer denies that he "lost control," but he concedes that he got frustrated with Long, finds him to be demanding, and does not get along with him.)

Long submitted an offender complaint regarding the incident. On November 25, 2014, Mathson called Long to the ICE office and told him that because the investigative process for employee investigations was regulated by state law (which protects the privacy and due process rights of staff) no further information would be given to him. Long provided a detailed written

description of the events he claimed happened, which was provided to Program Supervisor Pettera and Education Director Cline for investigation. On December 2, 2014, Mathson recommended that Long's inmate complaint be dismissed with the modification that it be further processed pursuant to DAI Policy 310.00.01 (employee investigation). Mathson noted that no further actions would be taken by the ICE's office. Haines accepted Mathson's recommendation and dismissed with modification the complaint on December 3, 2014.

Cline and Pettera were responsible for investigating the incident as an employee investigation. They spoke with Hammer, as well as eyewitnesses to the encounter. Cline and Pettera concluded that the exchange between Long and Hammer was loud enough to attract attention in a room full of people who were busy working at computers at the time, but that it was very brief. They noted that the inmate witnesses' reports did not support Long's assertion that Hammer was "screaming," but were similar enough that it Hammer probably did raise his voice. Further, a staff member acknowledged that both voices were loud.

Based on the investigation, Cline and Pettera determined that Hammer violated a work rule by failing to exercise good judgment in dealing with offenders. Hammer received a "job instruction" as a result.

**G.    Money Disbursement for Extra Copies**

On November 25, 2014, Long requested 52 copies from the inmate library clerk and submitted a disbursement request for $7.80. After he received his copies, Long told Hammer that the inmate clerk had made a mistake in copying the documents. Long claimed all of his original documents were single sided except for a 9-page double-sided Rental Agreement, which needed to be changed to single sided. Hammer responded that Long would need to re-submit

8

a disbursement request to cover the cost of the additional copies. (Long says that Hammer blamed him for the clerk's mistake.) Long then re-submitted a disbursement request for $10.50, noting he now needed 70 legal copies.

Long sent several letters to Pettera and Warden Haines regarding the incident and stated that Hammer had threatened to keep the documents or write a conduct report if he did not pay for all of the copies. Pettera notified Cline that Long was challenging a $2.70 charge for the additional copies. Cline contacted the PDCI Business Office and instructed her to credit $2.70 back to Long's account.

On December 8, 2014, Long submitted an offender complaint regarding the incident. Mathson investigated Long's complaint and found that his trust account had already been credited $2.70 for the copies on January 5, 2015 and as such rejected this complaint as moot.

### H. January 23, 2015 Yelling Incident

On January 23, 2015, Long was in the library when he heard Hammer asking unit staff about an inmate who had signed up for library but did not show up. Long knew the inmate was at the hospital, so he approached Hammer's desk to tell him so. Hammer was annoyed that Long had approached him while he was on the phone and yelled at Long to leave the library. He was eventually able to return to the library. Long told Hammer he was going to file an inmate complaint about the incident. He did so on January 29, 2015, but it was dismissed because supervisory staff had already been notified about the incident. In particular, Cline had been notified and had talked to Long and Hammer about the incident.

I.  **Declarations from Other Inmates**

Long submitted nearly identical declarations from several inmates who state that they were aware Long had submitted inmate complaints about Hammer and that after he did so, they witnessed Hammer treating Long "very disrespectfully and contemptuously." They also state that, on an unspecified date, they overheard Hammer talking on the telephone stating, "Long's a trouble-maker for filing complaints against me and deserves everything he gets," and "This will teach Long to file complaints against me!" Dkt. 41, 42, 43, 44.

OPINION

Long contends that Hammer retaliated against him in violation of his First Amendment rights after he filed inmate complaints about Hammer's behavior. Long also contends that defendants Brewer, Cline, Pettera, Mathson and Haines were aware of Hammer's pattern of retaliation but took no steps to prevent it from occurring. "An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). To succeed on his retaliation claims, Long must prove that he: (1) engaged in a constitutionally protected activity; (2) defendants took one or more retaliatory actions that would deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) his protected activity was one of the reasons defendants took the action they did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005).

Here, Long's inmate complaints qualify as constitutionally protected activity. *Hoskins*, 395 F.3d at 375. But Long's retaliation claim falters on the second element: he has identified

no adverse action severe enough to deter a person of ordinary firmness from exercising his First Amendment rights. Long identifies the following actions by Hammer as retaliatory adverse actions:

- May 27, 2014 yelling incident;

- Refusal to allow plaintiff library time during open periods for which he had not signed up in advance;

- Refusal to allow plaintiff to use the LexisNexis computers for word processing;

- November 18, 2014 yelling incident

- Charging plaintiff for a copy error caused by the library clerk; and

- January 23, 2015 yelling incident.

Setting aside the three incidents in which Hammer lost his temper and yelled at Long, there is no evidence that any of the other three incidents was an adverse actions sufficient to deter a person of ordinary firmness from filing future complaints. As a starting point, Hammer's refusal to allow Long to use the library during unscheduled open periods, as well as Hammer's refusal to permit Long to use word processing programs on the designated research computers, both were based on institution policies that were enforced against all inmates. Long tries to make it personal to him, but it wasn't. Application of standard prison regulations do not amount to adverse actions sufficient to maintain a retaliation claim. *See, e.g., West v. Kingsland*, -- Fed. Appx. --, 2017 WL 579389 (7th Cir. 2017) (holding that cell search did not constitute an adverse action where prison regulation required cells to be searched monthly if not more often) (citing *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (explaining that routine activities are not materially adverse actions suggesting retaliation)).

This is particularly true in this case, where the evidence shows that, despite Long's displeasure with the prohibition against library visits during unscheduled open periods, Long

11

nonetheless managed to visit the library about 280 times from May 1, 2014 to December 31, 2014. That's an average of eight library sessions every week. Long's contention that this is evidence of the defendants' retaliatory interference with his library access is, at best, a self-absorbed mischaracterization of a benign situation.

To the same effect, Long has submitted no evidence suggesting that he was unable to type necessary documents as a result of being restricted to using the designated word processing computers, a restriction that was longstanding and generally applicable to PDCI inmates. Long is irritated that he was not provided with an exception to a restriction with which he disagreed. It is Long's prerogative to be irritated if PDCI staff does not treat him as exceptional; that, however, does not mean that state employees have violated his constitutional rights. In short, he has no evidence that these restrictions were sufficiently adverse such that they would cause someone to refrain from filing grievances in the future.

Next, Long has no evidence that the copying incident was a sufficiently adverse action. He alleges that he was required to pay $2.70 for a disputed photocopying job, but it is undisputed that he was reimbursed for those copies after he complained about it. No reasonable jury would conclude that such an incident would deter a person of ordinary firmness from filing inmate complaints in the future. *Cf. Bridges*, 557 F.3d at 555 ("A single retaliatory disciplinary charge that is later dismissed is insufficient to serve as the basis of a § 1983 action.") As a matter of fact it *didn't* deter Long: he still filed an inmate complaint after he got his money back.

This leaves the three incidents in which Hammer lost his temper and yelled at Long in a disrespectful manner. If Long's version of events is true—which I am assuming for the purposes of this order—then Hammer's behavior was inappropriate and blameworthy, no

matter how frustrated or annoyed Hammer might have been in the moment. That being said, Hammer's behavior did not violate Long's constitutional rights. "[T]he Constitution does not compel guards to address prisoners in a civil tone using polite language," *Antoine v. Uchtman*, 275 Fed Appx. 539, *1, 2008 WL 1875948 (7th Cir. 2008), and it "would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Courts routinely reject retaliation claims based solely on incidents of verbal harassment or other conduct that was not sufficiently adverse. *See, e.g., Gallo v. Stokes*, -- Fed. Appx. --, 2017 WL 1434408, *2 (7th Cir. Apr. 24, 2017) (verbal reprimand for filing a grievance was not "severe enough" to deter future protected speech); *Antoine*, 275 Fed. Appx. at 541 (threats and racist comments by guards insufficient to sustain retaliation claim); *Salem v. Spryes*, 2014 WL 2698586, *2 (N.D. Ill. June 13, 2014) (prison staff action of giving 10–minute Christian sermons, forcing inmates to pray to veterans, calling plaintiff a "piece of shit, saying plaintiff was another inmate's girlfriend and throwing another inmate"'s Koran not sufficiently adverse to sustain retaliation claim); *Heard v. Hardy*, 2013 WL 3812102, at *3 (N.D. Ill. Jul. 22, 2013) (no retaliation claim based on allegations that guard "overly tightened [plaintiff's] handcuffs (from which [plaintiff] suffered no injury and sought no medical attention), made him stand for hours in [the] shower area, and teased him about his father's passing); *Sanders v. Salemi*, 2012 WL 353844 (N.D. Ill. Feb 1, 2012) (no retaliation claim where officer held out her middle finger, stuck out her tongue, and said that she would "get" him).

Long has provided only a vague description of Hammer's verbal harassment and has not alleged that Hammer threatened Long with, or subjected Long to physical harm,

13

punishment or any other sanction. Basically, Hammer yelled at Long three times in eight months. No reasonable jury could conclude from Long's evidence that any person of ordinary firmness would be deterred from exercising his First Amendment rights by these verbal encounters. Again, none of this deterred Long. Accordingly, Long's retaliation claim against Hammer fails.

Finally, it follows from this that the remaining defendants cannot be liable for failing to intervene when there was no underlying constitutional violation for them to prevent. They are entitled to summary judgment along with Hammer. *Fillmore v. Page*, 258 F.3d 496, 506 (7th Cir. 2004).

ORDER

IT IS ORDERED that:

(1) Plaintiff Peter J. Long's motion to strike (dkt. 55) is DENIED.

(2) The motion for summary judgment filed by defendants Michael Hammer, Ronald Brewer, Chad Cline, Lisa Pettera, Mandy Mathson and Tim Haines (dkt. 25), is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 8th day of August, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge